# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SUSAN G. BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-222-GKF-TLW |
| | ) | |
| WINDSTREAM COMMUNICATIONS, | ) | |
| INC., a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment [Dkt. #36] of defendant Windstream Communications, Inc. ("Windstream").

Susan G. Bennett ("Bennett"), a former technician for Windstream, sued the company for gender discrimination under Title VII (First Cause of Action); retaliation in violation of Title VII (Second Cause of Action); violation of the Oklahoma Antidiscrimination Act ("OADA") (Third Cause of Action); age discrimination under the Age Discrimination in Employment Act ("ADEA") (Fourth Cause of Action); and constructive discharge in violation of Oklahoma public policy and federal law (Fifth Cause of Action). Windstream seeks summary judgment on all of Bennett's claims.

## I. Material Facts

Windstream, a telecommunications company based in in Little Rock, Arkansas, provides services to both business and residential customers. In late 2011, Windstream acquired Paetec Communications, Inc. ("Paetec"), another telecommunications company. It took over operations effective on or about January 1, 2012. [Dkt. #50, Ex. 3, Bennett Dep., 44:11-16].

Bennett, a 38-year veteran of the telecommunications industry, was a Fiber Optic Tech III ("FOTIII") for Paetec at the time of the takeover. [*Id.*, Ex. 12, Bennett Resume]. As a Fiber Optic Tech III, she was responsible for locating fiber optic cable, repairing, splicing and testing it, and performing preventative weekly and monthly maintenance of various sites. [*Id.*, Ex. 3, Bennett Dep., 22:11-25; 30:11-25]. Her service area covered Stroud, Kiefer, Tulsa, Muskogee and Vian in Oklahoma and Van Buren and Ozark in Arkansas. [Dkt. #36, Ex. 3, Bennett Dep., 23:22-25:2]. Bennett sometimes travelled to Oklahoma City, Norman and Washington, Oklahoma to cover for another technician. [*Id.*, 153:23-154:6].

Bennett's pay and benefits remained the same after Windstream purchased Paetec. [Dkt. #36, Ex. 5, Ginine Stover Dep., 32:9-23].

When Windstream took over, Bennett was working out of a regeneration ("regen") site in Vian, Oklahoma. [Dkt. #50, Ex. 3, Bennett Dep., 26:14-20]. A regen site is a building where fiber optic cable goes through equipment that boosts the signal. [*Id.*, Ex. 3, 26:10-15]. Bennett had a little office in the building. [*Id.*, Ex. 3, 27:15-17].

Donald Rogers ("Rogers"), Area Manager of Operations for Windstream, was Todd Moore's ("Moore") direct supervisor during the time Moore was a local manager for Windstream. [Dkt. #36, Ex. 4, Donald Rogers Declaration, ¶¶2, 4]. Following Windstream's acquisition of Paetec, certain former Paetec technicians located in Oklahoma and Missouri—including Bennett—were placed under Moore's supervision. [*Id.*, ¶5]. Windstream's Tulsa office became Bennett's reporting site. [*Id.*, ¶6].[1] The other former Paetec technicians located in Oklahoma were also assigned to either the Tulsa office or a similar Windstream office located in

---

[1] According to Mapquest, Gore is approximately 75 driving miles from Tulsa. [Dkt. #54, Ex. 6].

Oklahoma City, depending on their service area. [*Id.*, ¶7].[2] No technicians were designated to report to the Vian regen site. [*Id.*, Ex. 5, Stover Dep., 15:1-9].

After the takeover, Moore implemented a requirement that all technicians in his group report each morning at 8:00 a.m. to their respective offices unless they had tasks to perform at another worksite. [Dkt. #36, Ex. 4, Rogers Dec., ¶8; Ex. 6, 04/29/2012 Moore Email; Ex. 7, 05/25/2012 Moore Email]. The requirement applied to all technicians regardless of age or gender. [*Id.*, Ex. 4, Rogers Dec., ¶8].[3] Ginine Stover, a Human Resources Business Partner III at Windstream, testified that this requirement—while not a Windstream written policy—was a standard Windstream practice. [*Id.*, Ex. 5, Stover Dep., 38:10-23].

Windstream's People Practices manual states that "[r]egular attendance and punctuality are important job requirements, equally as important as other job performance expectations." [Dkt. #36, Ex. 1, p. 29]. *See also* Ex. 1, p. 41 ("Regular attendance is an essential function of the job, equally as important as other job performance expectations."). "Refusal to work or complete job duties" and "insubordination" are among the grounds justifying termination of employment. [*Id.*, Ex. 1, p. 72].

Windstream has a telecommuting policy. [Dkt. #36, Ex. 1, People Practices manual, p. 21]. However, Stover testified that Bennett's job is not one where she could telecommute, so she would not be able to avail herself of this policy. [Dkt. #50, Ex. 1, Stover Dep., 62:22-63:8].

---

[2] Moore testified each technician was required to report to the manned office closest to his or her home. [Dkt. #36, Ex. 8, Moore Dep., 22:17-23:4]. Everything between Bennett's house and Tulsa was an unmanned site. [*Id.*, 23:6-7].

[3] Bennett, who lives in Gore, Oklahoma, complains that she was the only employee required to travel two hours to an office every day, and neither "the Oklahoma City technician nor Arkansas technician" were required to do so. [Dkt. #50 at 8, ¶9]. In her deposition she identified the Oklahoma City technician as Wilbert Todd and the Arkansas technician as Steve Clark. [*Id.*, Ex. 3, Bennett Dep, 28:9-17; 141:8-142:6]. She testified Todd did not report to the Tulsa office, but she did not know what was going on with the Oklahoma City office. [*Id.*, Ex. 3, 64:22-65:4]. She testified Clark told her he was not required to report to an office. [*Id.*, 141:17-142:8]. Clark, however, is not in Moore's group, which included technicians in Oklahoma and Missouri. [Dkt. #36, Ex. 4, Rogers Dec., ¶5; Ex. 6, Moore Email].

Windstream also has a relocation policy. [*Id.*, Ex. 8, p. 28]. However, Stover testified Bennett's commute distance would not qualify her for any type of moving or relocation assistance from Windstream. [*Id.*, Ex. 1, Stover Dep., 63:12-20].

Finally, the People Practices manual has a section titled "Flexible Work Programs." [Dkt. #36, Ex. 1, pp. 54-55]. The section states, in pertinent part, "Managers have the discretion to design and implement flexible work programs that are most effective for their individual work groups given their business requirements," and "the design of flexible work programs will be at each manager's discretion." [*Id.*, pp. 55-56]. Stover testified that Windstream "ha[s] various schedules depending on the business needs and the number of days that we need to cover and what our commitments are to the customers." [Dkt. #50, Ex. 1, 61:22-62:2]. Stover testified Bennett never requested an accommodation from the requirement that she report to Tulsa at 8 a.m. [*Id.*, 61:16-21]. When asked, "If Ms. Bennett had requested an accommodation for leave not to report each day at 8 a.m., would that have been considered under Windstream's policies for a flexible work schedule?" Stover responded, "I think what I define as flexible work schedule is the different shifts. . . . Monday through Friday, Tuesday through Saturday, Wednesday through Sunday. . . But the standard business hours are 8 to 5." [*Id.*, 62:3-16]. Stover stated that, in Windstream's opinion, the flexible work program could not have applied to Bennett's situation. [*Id.*, 64:19-22].[4]

Rogers testified that one of the reasons technicians were required to report to the Tulsa office was due to the volume of work and the number of Windstream customers in the Tulsa and

---

[4] At some point Bennett had a conversation with Stover and Moore in which Bennett expressed "concern[] about the distance to the Tulsa office based on some responsibility she had to care for her mother," and Stover "had let her know if she needed an [FMLA] accommodation what the process was and that she would need something in writing . . . [w]hich [was] basically the FMLA paperwork that they would file that their physician would fill out." [Dkt. #50, Ex. 1, Stover Dep., 71:3-72:10]. No further steps were taken because Stover did not pursue an FMLA accommodation. [*Id.*, 71:20-72:1].

northeastern Oklahoma area.  [Dkt. #36., Ex. 4, Rogers Dec., ¶9].[5]  Another reason technicians were required to report to the Tulsa and Oklahoma City offices was to enable the integration of Paetec into Windstream.  A component of this integration involved cross-training, wherein Paetec technicians and Windstream technicians worked together in order to learn each other's jobs and familiarize themselves with their counterparts' equipment and procedures. [*Id.*, ¶10].[6] After the implementation of the reporting requirement, no technicians were designated to report to the Vian regen site.  [*Id.*, Ex. 5, Stover Dep., 15:1-9].

Rogers testified that shortly after Windstream began requiring technicians to report to their assigned offices, Bennett advised him "that she 'could not' report to the Tulsa office at 8:00 a.m. due to its distance from her home in Gore, Oklahoma;" "[t]hereafter, Ms. Bennett repeatedly arrived at the Tulsa [office] after 10:00 a.m., and, on a number of occasions, did not report to the Tulsa office when she was required to do so;" and "[o]n several occasions she left the Tulsa office in early or mid-afternoon to drive home, rather than staying until her workday ended at 5:00 p.m." [Dkt. #36, Ex. 4, Rogers Dec., ¶11].  Rogers testified that in contrast, a male technician, Dale Young, commuted to the Tulsa office each day from Okay, Oklahoma,[7] consistently arriving at the office on time at 8:00 a.m. and staying until the end of his shift at 5:00 p.m. [*Id.*, ¶12].

Bennett testified that when she reported to the Tulsa office for integration and cross training, she was put in a cubicle and not allowed access to the equipment.  [Dkt. #50, Ex. 3, Bennet Dep., 147:5-24].  However, according to Rogers, Bennett's refusal to report to the Tulsa

---

[5] Bennett admitted there were more customers and site maintenance in the Tulsa area than in the Vian, Gore area. [Dkt. #36, Ex. 3, Bennett Dep., 61:3-15].
[6] Bennett disputes this statement, citing testimony of corporate representative Aaron Morris. [Dkt. #50 at 8, ¶8, Ex. 6, Morris Dep., 21:6-21].  Morris testified he was not personally aware of any mandatory cross-training that was required of each employee who was formerly a Paetec employee.  Importantly, though, plaintiff does not deny cross training was taking place, or that the cross training involved shadowing, and she contends Windstream's failure to cross-train her was an "adverse action."
[7] According to internet map resources, the distance between Okay and Tulsa is 49 miles.

office at the required time made it impossible to implement a complete cross-training program for her because often, the Windstream technician she was supposed to train with had left the office to begin work in the field by the time Bennett arrived at the Tulsa office at mid-morning. [Dkt. #36, Ex. 4, Rogers Dec., ¶13]. Rogers testified that if Bennett had complied with the requirement to report to the office at 8:00 a.m., she would have received the same cross-training opportunities as all other technicians. [*Id.*].

Bennett testified she is unaware of any male employees who were offered integration training that was not offered to her. [Dkt. #36, Ex. 3, Bennett Dep., 117:2-7]. She admits Moore did not tell her she would not be permitted to train with respect to the part of the integration she had not been trained on. [*Id.*, 117:10-22]. Further, she admits she understood she was required to report to the Tulsa office at 8:00 a.m. [*Id.*, 74:3-20, referencing Ex. 6, Moore Email]. Bennett testified she understood the integration occurred at the Tulsa office and she participated in such integration on at least one occasion. [*Id.*, Ex. 3, Bennett Dep., 50:24-51:25]. Stover testified that Bennett's failure to report at the office at 8 a.m. violated Windstream practice. [Dkt. #36, Ex. 5, Stover Dep., 73:10-13].

Windstream has a progressive disciplinary policy. [Dkt. #50, Ex. 1, Stover Dep., 74:17-19]. The nondisciplinary first step of the policy is coaching, which may involve "positive kudos" or "a conversation for an area of improvement." [*Id.*, 74:23-75-1; 75:8-11]. Coaching does not require documentation or HR involvement. [*Id.*, 75:12-20]. The next step, final coaching, is the first disciplinary step, and the second disciplinary step is either a written warning or a performance improvement plan ("PIP"). [*Id.*, 75:2-4]. Final coaching is also called a "documented verbal warning," and it goes in the employee's personnel file. [*Id.*, 76:4-12]. The steps after that are a final written warning and then termination. [*Id.*, 75:6-7].

On May 22, 2012, Moore and Stover gave Bennett a final coaching session concerning attendance. [Dkt. #36, Ex. 5, Stover Dep.,76:1-24; Ex. 9, Final Employee Coaching Session]. The same day, in a phone call with Moore and Rogers, Bennett reported that she was having chest and shoulder pain and had an appointment to see a cardiologist on May 23. [Dkt. #50, Ex. 4, Moore Dep., 39:15-40:2]. She reported the pain was from work-related stress. [*Id.*, 38:6-16]. At Rogers' direction, Moore completed a Supervisors Investigation Report and the two called Stover and told her the report was coming. [*Id.*, 40:8-17; Ex. 10, Supervisors Investigation Report]. Windstream policy requires managers to report alleged workplace injuries to the company's workers' compensation carrier. [Dkt. #36, Ex. 1, People Practices manual, p. 49].[8] Moore gave Bennett a telephone number to call and a claim number. [*Id.*, Ex. 3, Bennett Dep., 106:9-17]. She completed and faxed an Authorization for Release of Information to Gallagher Bassett Services, Inc., for the claim. [*Id.*, Ex. 11].

Bennett began a leave of absence on Monday, May 28, 2012. [Dkt. #36, Ex. 16, Stover Affid., ¶7].

Windstream's policy with its short term disability carrier, MetLife, requires an employee to initiate a short term disability claim if the employee is out for more than three consecutive days or several intermittent days. [Dkt. #36, Ex. 1, People Practices manual, p. 44; Ex. 5, Stover Dep., 90:17-91:19]. Bennett's last day of work was Friday, May 25, 2012, and MetLife issued short term disability benefits to her through June 27, 2012. [Dkt. #36, Ex. 14, July 23, 2012 Letter from MetLife to Bennett]. MetLife closed the claim and no benefits were paid after that date because Bennett had not provided requested medical information. [*Id.*].[9]

---

[8] Bennett, however, complains she did not intend for Windstream to treat her response to her supervisor's question as a claim for workers compensation benefits. [Dkt. #50 at 10-11, ¶17; Ex. 3, Bennett Dep., 110:3-9]

[9] Bennett asserts that after short term disability benefits were discontinued, Windstream began unilaterally applying her personal and sick leave time. [Dkt. #50, Ex. 3, Bennett Dep., 128:19-129:3]. Bennett also testified, though, that

Windstream paid out Bennett's remaining vacation days and optional holidays from Monday, July 2, 2012 through Friday, July 27, 2012.  [Dkt. #36, Ex. 19, August 8, 2012 Letter from Stover to Bennett].

On June 15, 2012, Windstream retrieved the company vehicle and tools that had been assigned to Bennett.  [Dkt. #36, Ex. 15, June 18, 2012 Email from Rogers to Bennett].  The vehicle was retrieved because Windstream was short on vehicles due to some vehicles being in the shop for repair.  [*Id.*, Ex. 5, Stover Dep., 136:6-14].  The tools were retrieved because they were needed by other technicians in Tulsa trying to "pick up the slack" in Bennett's absence. [*Id.*, Ex. 8, Moore Dep., 67:3-9].

Windstream technicians are permitted to keep their company vehicles when they are on call.  [*Id.*, 92:23-93:18].  Bennett was never denied the use of her company vehicle and tools while she was on call.  [*Id.*, 94:18-24].  Plaintiff was not using the vehicle or tools at the time Windstream retrieved them.  [*Id.*, 67:3-9]. Moore testified that had Bennett returned to work, she would have been provided with a company vehicle and tools necessary to perform her job. [*Id.*, 84:7-13].  The retrieval of the vehicle and tools from Bennett at the time she was unable to work was not a demotion and did not affect her pay or benefits.  [*Id.*, Ex. 16, Stover Affid., ¶¶4-5].

Bennett testified she sent an email to Moore complaining that she was being discriminated against.  [Dkt. #36, Ex. 3, Bennett Dep., 121:6-8].[10]  She also said she believes she told Stover during a telephone call that she was being discriminated against, but she doesn't remember when.  [*Id.*, 122:17-123:4].

On June 18, 2012, Bennett sent Windstream Area Manager of Operations Glenn "Bud" Koser an email forwarding an email she had sent Moore the same date. [Dkt. #36, Ex. 20A].  In

she didn't want short term disability and had previously asked to use vacation and sick time instead.  [*Id.*, 128:5-9; 129:4-8].

[10] Bennett appears to be referring to an August 3, 2012 email she sent to Moore and Rogers. [Dkt. #50, Ex. 10].

the original email, Bennett asked Moore to send a letter stating he had picked up the company vehicle and tools from her home on June 15, 2012. The email from Bennett to Koser stated, "For your information on what's going on and thank you for having a talk with Todd. He hasn't been harassing and hateful to me since." [*Id.*]. Koser then forwarded the thread to Stover, stating, "FYI. This is the first I have heard about Todd being hateful and harassing Susan." [*Id.*]. Koser stated in his affidavit, "At no time prior to or after June 18, 2012, did Ms. Bennett indicate to me that she believed anyone at Windstream had discriminated against her based upon either her age or gender." [*Id.*, Ex. 20, Koser Affid., ¶5].

On July 26, 2012, Windstream sent Bennett a letter giving her the option to (1) return to work, (2) provide medical documentation supporting short term disability or (3) resign. [*Id.*, Ex. 17, Email and Letter from Stover to Bennett]. The letter stated, "If you do not elect one of these options by 5:00 PM, on August 3, 2012, we will treat your absence as job abandonment and terminate your employment effective that day." [*Id.*].

The so-called "three options letter" is sent to all Windstream employees who are out on leave of absence and have not received an extension from MetLife. [*Id.*, Ex. 5, Stover Dep., 143:17-144:19].

Bennett did not exercise any of the three options. [*Id.*, Ex. 3, Bennett Dep., 180:1-181:10; Ex. 5, Stover Dep., 144:20-23]. She understood that if she did not do so, she would be deemed to have abandoned her job. [*Id.*, Ex. 3, Bennett Dep., 181:11-17].

On August 3, 2012—the deadline for her response to the three options letter—Bennett sent an email to Moore and Rogers, with a copy to Stover, stating:

> The discriminating conditions you have placed on me have made it impossible to work for Windstream. I have tried to work with you regarding relocation to Tulsa but you have been unwilling to listen to me or my concerns. I cannot relocate to Tulsa. The absentee case you have constructed for my discharge is meritless.

> Your persistent harassing, hateful and hostile calls have caused undue stress, strain and pain which affected my health. It was unnecessary and discriminatory. You have robbed me of my income, future and a job I loved. I have no choice but [to] petition severance pay to support myself and health needs and get out from under this constant state of distress.

[Dkt. #50, Ex. 10, Bennett Email to Moore and Rogers].

Bennett failed to return to work following her leave of absence. [Dkt. #36, Ex. 16, Stover Affid., ¶8]. On August 8, 2012, Stover sent Bennett a letter informing her that since Bennett had failed to provide additional medical documentation to extend her leave of absence, "effective August 7, 2012, your employment with Windstream is being separated" based on Bennett's failure to return from the leave of absence. [*Id.*, Ex. 19].

Bennett testified that she complained to Steve Clark, the Arkansas technician, that she felt she was being discriminated against because of her age and gender sometime before she filed her lawsuit, although she does not remember the actual date or month. [Dkt. #50, Ex. 3, Bennett Dep., 120:23-121:4; 121:9-21]. She acknowledged that Clark was not her supervisor, nor was he in HR. [*Id.*].

Windstream has policies against employment discrimination. [Dkt. #36, Ex. 1, People Practices manual, p. 15; Ex. 2, Working with Integrity Booklet, pp. 8-9]. Its People Practices manual requires employees to report incidents of harassment or discrimination to a supervisor, a Human Resources representative, the Employee Relations Director or the Working with Integrity Hotline. [Dkt. #36, Ex. 2, Working with Integrity Booklet, p. 9]. Bennett did not lodge any complaints of age or gender discrimination with Human Resources, the Employee Relations Department or the Working with Integrity Hotline. [Ex. 16, Stover Affid., ¶9].

## II. Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. . . . An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670 (citations omitted). In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will

be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Id.* at 252.

## III. Analysis

### A. ADEA and Title VII Gender Discrimination Claims

In the absence of direct discrimination,[11] courts analyze both gender and age discrimination claims under the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Adamson v. Multi Community Diversified Services*, 514 F.3d 1136, 1145 (10th Cir. 2008); *Jones v. Oklahoma City Pub. Schs.*, 617 F.3d 1273, 1278-79 (10th Cir. 2010).

Under *McDonnell Douglas*, the aggrieved employee must first establish a prima facie case by showing: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class. *Jones*, 617 F.3d at 1279 (citing *Sanchez v. Denver Pub. Schs.*, 164 F.3d527, 581 (10th Cir. 1998)).[12] Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the action. *Adamson*, 514 F.3d at 1145. If the employer does so, the plaintiff must produce evidence of pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

---

[11] "Direct evidence of discrimination is evidence which, if believed, proves that the decision in the case at hand was discriminatory—and does so without depending on any further inference or presumption." *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012). "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons. *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002).

[12] The Tenth Circuit has indicated that it favors a more recent three-part test articulated by the Supreme Court in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). *See Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005); *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 n.4 (10th Cir. 2013). However, since the parties both cited and relied on the four-part test in their arguments, the court, likewise, has applied the four-part test in its analysis.

a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jones*, 617 F.3d at 1280.

### 1. Prima Facie Case

"In the summary judgment context, a plaintiff must initially raise a genuine issue of material fact on *each* element of the prima face case." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (emphasis added).

### a. Whether Plaintiff was a Member of a Protected Class

Windstream does not contest that Bennett has established the first element of a prima facie case for both gender and age discrimination, inasmuch as she is a female and was 56 years old at the time of the events giving rise to this lawsuit.

### b. Whether Plaintiff Suffered an Adverse Action

Bennett contends that Windstream took adverse action against her by (1) requiring her to report daily to the Tulsa office; (2) instituting disciplinary proceedings against her when she failed to do so; (3) requiring her to complete a workers' compensation claim form when she reported chest and shoulder pain she believed was induced by workplace stress; (4) filing a claim for short term disability on her behalf; (5) retrieving its vehicle, tools and fuel card from Bennett while she was on leave; (6) denying her cross-training opportunities and (7) terminating her.

The Tenth Circuit has stated:

> Conduct rises to the level of 'adverse employment action' when it constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. . . . Actions presenting nothing beyond a mere inconvenience or alteration of responsibilities, however, do not constitute adverse employment action.

*Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (citations omitted).

The requirement that Bennett report daily to the Tulsa office did not constitute an adverse employment action. There was no change in Bennett's salary or benefits. Further, the record establishes Bennett was already required to travel in her job before Paetek was acquired by Windstream. The Tenth Circuit has held that imposition of a travel requirement does not constitute a significant change in a plaintiff's employment status. *See*, *e.g.*, *Sanchez*, 164 F.3d at 532 (teacher's longer commute after being transferred from one school to another not adverse employment action when teacher's salary and benefits remained the same); *Martin v. Northfork Elec. Co-op., Inc.*, 2005 WL 2777032, at *5 (W.D. Okla. Oct. 25, 2005) (reassignment of lineman to different district did not constitute adverse employment action where, even prior to reassignment, his job required some travel); *Hill v. Steven Motors, Inc*., 2004 WL 958097 (10th Cir. 2004) (car dealer's placement of plaintiff in the fleet and leasing manager position was not an adverse employment action simply because it required her to travel because it did not constitute a significant change in her employment status); *Vann v. Southwestern Bell Tel. Co.*, 179 Fed. Appx. 491, 497-98 (10th Cir. 2006) (relocation of employee who had recently transferred from Wichita to Tulsa back to Wichita did not constitute adverse action).

Nor did the Final Employee Coaching Session constitute an adverse action, as it had no significant impact on Bennett's pay, benefits, work assignments or employment status. *See Haynes v. Level 3 Commc's, LLC*, 456 F.3d 1215, 1224-25 (10th Cir. 2006) (placement of employee on performance improvement plan ("PIP") was not an adverse action because it had no immediate effect on her employment status); *Anderson v. Clovis Mun. Schs*, 2008 WL 410435 (10th Cir. Feb. 15, 2008) (neither placement of teacher on "growth plan" nor subsequent issuance of formal reprimand constituted adverse employment action because neither act served as a demotion, altered his pay or changed his responsibilities in any significant manner); *Garcia*

*v. Bd. of Regents of the Univ. of New Mexico*, 2010 WL 2606285 (D. N.M. Jun. 2, 2010) (counseling letter addressing perceived deficiencies in employee's performance did not constitute adverse action); *Foreman v. Western Freightways, LLC*, 958 F. Supp. 2d 1270, 1278 (D. Colo. 2013) (warning letters and placement of employee on PIP were not adverse actions because neither had any significant effect on his pay, benefits, work assignments or employment status).

Similarly, Windstream's reporting of Bennett's alleged workplace injury to the insurance carrier was not an adverse employment action. At the time of the alleged injury employers were required, within 10 days of receipt of notice of an injury, to make a written report of the injury to the Workers' Compensation Court and to the employer's workers' compensation insurance carrier; failure to make the report subjected the employer to liability for an administrative violation and fine. Okla. Stat. tit. 85, § 322(B) & (D) (superseded effective Feb. 1, 2014). An employer's "proper exercise of a legal right to discharge a legal obligation plainly cannot form the basis of an adverse employment action." *Ugorji v. New Jersey Envtl. Infrastructure Trust*, 2012 WL 1964524, at *5 (D. N.J. May 30, 2012) (citing *Flint v. City of Phila.*, 1998 WL 480849, at *5 (E.D. Pa. Aug. 12, 1998)).

Likewise, Windstream's initiation of a short term disability claim on Bennett's behalf was not an adverse action. Windstream's employee benefits program includes a short-term disability plan. The short term disability carrier, MetLife, requires an employee to initiate a short term disability claim if she is out for more than three consecutive days or several intermittent days. Bennett reported an alleged work-related injury to Windstream on May 22, 2012. When she did not return to work after three days, Windstream referred her to the short term disability plan carrier. Bennett then contacted MetLife and initiated a claim, and MetLife provided short

15

term disability benefits for the period of May 28, 2012, through June 27, 2012.  Bennett has identified no harm she suffered by being paid short term disability.  Indeed, short term disability is a *benefit. See Butler v. Exxon Mobil Corp.*, 838 F. Supp. 2d 473, 492 (M.D. La. 2012)

The retrieval of Windstream's truck and tools was not an adverse action.  Plaintiff left work on May 22, 2012, and never returned.  During her absence, Windstream requested that she return the company vehicle and tools, but she did not do so.  On June 15, 2012, Windstream retrieved the company vehicle and tools so that other technicians working out of the Tulsa office could perform their duties.  Bennett was permitted to retain her company laptop and printer. Windstream allows "home garaging" only in limited circumstances. Specifically, when the technician needs his or her vehicle first thing in the morning to travel to a remote site and has prior notice, the technician can take the vehicle home the night before.

Windstream did not deny Bennett cross-training opportunities.  The undisputed record establishes that after Windstream acquired Paetec, it initiated an integration program that involved cross-training of technicians from the two companies.  The integration and cross-training required technicians to report to the Tulsa office each workday at 8 a.m. Bennett refused to do so, instead showing up mid-morning—well after most technicians had been paired up and departed.  The testimony of Don Rogers established that, as a result, Bennett could not be fully cross-trained.

Finally, the record does not support Bennett's claim that she was involuntarily terminated.  The letter Windstream sent her on July 26, 2012 gave her the option to return to work, provide medical documentation supporting short term disability or resign.  She understood that if she failed to exercise one of these options, she would be deemed to have abandoned her job.  She failed to elect one of these options and instead, on the August 3, 2012 deadline, sent an

email accusing Windstream of subjecting her to "discriminating conditions" and alleging the employer's "harassing, hateful and hostile calls have caused undue stress, strain and pain which affected my health." Effective August 7, 2012, she was separated from employment for failure to return from the leave of absence. The court concludes plaintiff was not involuntarily terminated.

Accordingly, the court finds Bennett has failed to establish she suffered an adverse employment action.

### c. Whether Bennett was Qualified for the Position at Issue

One of the requirements of Bennett's job was that she report daily to the Tulsa office at 8 a.m. because of the volume of Windstream's work and customers in northeastern Oklahoma, and in order to cross train. Bennett was unable and/or unwilling to do this. Her failure to report to Tulsa in a timely manner rendered her unqualified for the job. *See Swilley v. City of Houston*, 2012 WL 29079, at *3 (5th Cir. Jan. 6, 2012) (plaintiff who was "affirmatively unwilling to comply with the basic organizational mandate for her position" was not qualified for the position at issue); *Williams v. Huntington Bancshares, Inc.*, 2006 WL 1406595, at *5 (M.D. Fla. May 22, 2006) (plaintiff who was not willing to work 40 hours a week was not qualified for the position of full-time Personal Banker, which required employee to work 40 hours a week); *Jenks v. Mountain States Tel. & Tel. Co.*, 1989 WL 226145, at **7-8 (D. Utah Mar. 8, 1989) (plaintiff who by her own admission could not perform duties of her position due to health condition and stress was not qualified for the position).

### d. Whether Bennett was Treated Less Favorably
### than Others Not in the Protected Class

The fourth prong of the *McDonnell Douglas* prima facie test requires a showing that the plaintiff was treated less favorably than employees not in the protected class. Under Fed. R. Civ.

P. 56, plaintiff must come forward with *admissible* evidence of disparate treatment. Her belief that she was discriminated against, without more, is insufficient. *See Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 977 (10th Cir. 1996) (rejecting plaintiff's claim that a reduction in force was merely a pretext for pruning away unwanted employees and stated, "Speculation . . . will not suffice for evidence.")

With respect to her age discrimination claim, Bennett has offered no evidence of disparate treatment. Regarding her gender discrimination claim, Bennett contends two other male employees—Steve Clark and Wilbert Todd—were not required to report to manned offices. However, she offers no admissible evidence in support of this contention. Her statement concerning Clark is inadmissible hearsay. *See Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) ("[A]t summary judgment courts should disregard inadmissible hearsay statements. "). Furthermore, Clark is not in the same group as Bennett. And although Bennett testified Todd was not required to report to the Tulsa office, she did not know whether he reported to the Oklahoma City office.

Furthermore, Windstream has presented evidence that a male employee, Dale Young, commuted to the Tulsa office each day from Okay, Oklahoma—a distance of some 50 miles— consistently arriving at the office on time at 8:00 a.m. and staying until the end of his shift at 5:00 p.m. Additionally, Windstream has presented evidence that cross training was offered to all employees, and that its policies regarding workplace injuries and short-term disability apply to all employees.

Bennett has failed to establish she was treated less favorably than male and/or younger employees.

## 2. Windstream's Legitimate, Nondiscriminatory Reasons for its Actions

Under the *McDonnell Douglas* burden shifting framework, once the plaintiff has made out a prima facie case, the employer must articulate a "legitimate, nondiscriminatory reason for the adverse employment action." *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009). The employer's burden is one of production, not persuasion. *Doubele v. Sprint/United Mgmt. Co.,* 342 F.3d 1117, 1135 (10th Cir. 2003). In this case—even if the court were to assume Bennett established a prima facie case—Windstream has come forward with legitimate, nondiscriminatory reasons for each of the alleged adverse actions. Specifically:

- With respect to the requirement that employees report to their assigned offices at 8:00 a.m. each day, Windstream introduced testimony that the requirement was implemented to accomplish the integration of Paetec into Windstream; in addition, with respect to the Tulsa office specifically, technicians were also required to report to the office due to the volume of work and customers located in the Tulsa area and northeastern Oklahoma.

- To the extent Bennett was denied cross training opportunities, Windstream has presented evidence this was a result of her failure to timely report to the Tulsa office.

- With respect to reporting Bennett's alleged injury to its workers' compensation carrier, at the time of the injury, Windstream was required by Oklahoma law to report the incident to its workers' compensation insurance carrier and to the Oklahoma Workers' Compensation Court. *See* Okla. Stat. tit. 85, § 322.

- With respect to Bennett's referral to Windstream's short-term disability carrier, the policy applies equally to all employees, is intended for the benefit of employees, and serves legitimate, nondiscriminatory business purposes of ensuring that injured

employees do not return to work prematurely, and promotes the retention of valuable employees by providing them with income during periods of disability.

- The retrieval of the company vehicle and tools from plaintiff occurred because, due to the large workload of technicians based in the Tulsa office and shortage of company vehicles, it was necessary for Windstream to reassign the truck and tools, at least temporarily, to another technician.

- Even if the court were to conclude Bennett was involuntarily terminated, Windstream proffered evidence that, as set forth in the People Practices manual, chronic attendance problems, refusal to work and insubordination are grounds for termination. [Dkt. #36, Ex. 1, pp. 29, 41, 72]. It is undisputed that Bennett failed to report to the Tulsa office on a timely basis; her supervisors provided her with a final coaching in an attempt to address her attendance issues; Windstream, in its "three options letter," gave her an opportunity to return to work; and that Bennett refused to return to work.

### 3. Pretext

Once an employer articulates a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show there is a genuine dispute about whether the proffered explanation was pretext for discrimination. *Lobato v. New Mexico Env't Dept.*, 733 F.3d 1283, 1289 (10th Cir. 2013).

> Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons. Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.

*Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (10th Cir. 1997) (citations omitted). "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (citations omitted).

Bennett makes the blanket assertion that "the 'reasons' set forth by Windstream  do not pass muster." [Dkt. #50 at 30].  She argues extensively that Windstream should have not have required her to report to the Tulsa office,  reported a workers' compensation claim, placed her on short term disability, retrieved the company vehicle and tools or sent her the "three options letter."  [Dkt. #50 at 27-28, 30-31]. However, "our role is not to second guess an employer's business judgment." *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004).  And neither Title VII nor the ADEA require employers to accord members of the protected class *preferential* treatment.  *See Johnson v. Transp. Agency, Santa Clara Cnty., Cal.*, 480 U.S. 616, 644 (1987) (Stevens, J. concurring) ("It remains clear that [Title VII] does not *require* any employer to grant preferential treatment on the basis of race or gender"); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) ("The ADEA dos not require employers to accord members of the protected class preferential treatment, but only that they treat age neutrally.").

Bennett has failed to present evidence creating a genuine dispute about whether Windstream's proffered legitimate business reasons were pretextual.  Therefore, Windstream is entitled to summary judgment on Bennett's Title VII and ADEA discrimination claims.

## B. Retaliation Claim

Title VII forbids retaliation against employees who voice opposition to, or participate in an investigation or proceeding alleging an unlawful employment practice by their employer.  42 U.S.C. § 2000e-3(a).  Where—as here—plaintiff seeks to prove her retaliation claim through

indirect or circumstantial evidence of discriminatory animus, the *McDonnell Douglas* burden shifting applies. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007).

To establish a prima facie case of Title VII retaliation, a plaintiff must establish (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have considered materially adverse; and (3) a causal nexus exists between her opposition and the employer's adverse action. *Id.*

Windstream contends Bennett has not established any of the three elements.[13]

Bennett asserts she "made at least three complaints to her supervisors about the discriminatory conduct." [Dkt. #50 at 33]. She does not identify the complaints. However, the record before the court shows that (1) she "thinks" she complained to Stover that she was being discriminated against, but she doesn't remember when; (2) in a June 18, 2012 email to Area Manager Koser she stated: "For your information on what's going on and thank you for having a talk with Todd. He hasn't been harassing and hateful to me since." [Dkt. #36, Ex. 20A]; and (3) in her August 3, 2012 response to the "three options letter" she accused Windstream of placing "discriminating conditions" on her. [Dkt. #50, Ex. 10, Bennett Email].

However, Bennett's vague references to complaining about "discrimination" satisfy neither the first element (that she engaged in protected activity) nor the third element (causal nexus between the protected activity and the adverse action) of a prima facie case of retaliation. "An employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Peterson v. Utah Dept. of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). Thus, "a vague reference to discrimination and harassment without any indication that this misconduct was motivated by

---

[13] Windstream concedes a discharge from employment is an adverse action, but contends it did not "discharge" Bennett; rather, she abandoned her job. *See* § III.A(1) above.

race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim." *Anderson v. Academy Sch. Dist. 20*, 122 Fed. Appx. 912, 916 (10th Cir. 2004).

Bennett has failed to come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire her had knowledge of her protected activity. *See Hinds v. Sprint/United Mgt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). Therefore, she has not established a prima facie case of Title VII retaliation.

### C. OADA Claim

Bennett asserts a claim for age and gender discrimination under the OADA. Under the OADA, a defendant may assert any defense available to it under the ADEA or Title VII. Okla. Stat. tit. 25, § 1350(F). The Tenth Circuit has held that a plaintiff's OADA claim fails if her federal discrimination claims fail. *See Barzellone v. City of Tulsa*, 2000 WL 339213, at *5 (10th Cir. Mar, 31, 2000).

### D. Constructive Discharge Claim

Bennett asserts a claim of constructive discharge in violation of Title VII and the public policy of Oklahoma, and seeks actual and punitive damages.

To the extent Bennett's claim is based on violation of Oklahoma public policy—i.e., a *Burk* tort claim—such claims were abolished effective November 1, 2011, when the OADA was amended to provide for "*exclusive* remedies within the state of the policies for individuals alleging discrimination in employment on the basis of race, color, national origin, *sex*, religion, creed, *age*, disability or genetic information." Okla. Stat. tit. 25, § 1101(A) (emphasis added).

With respect to Bennett's federal claim, "[c]onstructive discharge occurs when the employer by its *illegal discriminatory acts* has made working conditions so difficult that a

reasonable person in the employee's position would feel compelled to resign." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004) (emphasis added). "Essentially, a plaintiff must show that she had *'no other choice* but to quit.'" *Sanchez*, 164 F.3d at 534 (citing *Yearous v. Niobrara Cty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997)). In evaluating such a claim, the court must "apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent . . . are relevant." *EEOC v. PVNF, LLC*, 487 F.3d 790, 805 (10th Cir. 2007) (citing *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004)).

"The plaintiff's burden in a constructive discharge case is substantial and showing that the employer's conduct meets the definition of 'tangible employment action' or 'adverse employment action' is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable." *PVNF*, 487 F.3d at 805..

Bennett's constructive discharge claim fails, first and foremost, because she has not established a prima facie case of any federal employment discrimination law violations. Further, even if she had presented evidence sufficient to establish a prima facie federal discrimination claim, she has not shown she had "no other choice but to quit." *Sanchez,* 164 F.3d at 534. To the contrary, she was given the alternatives of supplying medical documentation of a disability, returning to work or severing her employment relationship. Clearly Bennett was unhappy with her job after the Windstream takeover. However, "not every unhappy employee has an actionable claim of constructive discharge pursuant to Title VII." *Bolden v. PRC Inc.*, 43 F.3d 545, 552 (10th Cir. 1994).

## IV. Conclusion

For the reasons set forth above, Windstream's Motion for Summary Judgment [Dkt. # 36] is granted.

ENTERED this 27th day of June, 2014.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT